AO 106 (Rev. 04/10) Application for a Search Warrant                                     AUTHORIZED AND APPROVED/DATE: ___EMJ 5/08/2024___

# UNITED STATES DISTRICT COURT
for the
Western District of Oklahoma

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. MJ-24-419-STE
ELECTRONIC DEVICE: an iPhone 15 Pro Max, )
assigned call number (737-298-7183), located in 2015 )
Kia Optima registered to VISHNU PALITHYA )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference herein.

located in the ___Western___ District of ___Oklahoma___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. s. 2251(a) | Sexual Exploitation of a Child. |
| 18 U.S.C. s. 2423 | Transportation of Minors |

The application is based on these facts:
See the attached Affidavit of FBI Special Agent David Garrison, which is incorporated by reference herein.

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

David Garrison, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **May 10, 2024**

*Judge's signature*

City and state: Oklahoma City, Oklahoma             SHON T. ERWIN, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, David A. Garrison, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since June 12, 2005. During the past 19 and half years, I have conducted a wide variety of investigations, including numerous cases involving the sexual exploitation of children. I submit this Application and Affidavit in support of a search warrant authorizing a search of an iPhone 15 Pro Max cell phone, with assigned number 737-297-7183 (hereinafter, the **"TARGET DEVICE"**). The **TARGET DEVICE** is located inside a vehicle registered to VISHNU PALITHYA (SUBJECT) that is currently in the custody of the Oklahoma City Field Office of the FBI, as further described in Attachment A.

2. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 2423(a), 2251(a), 2252A(a)(2)(B), and 2252A(a)(5)(B) have been committed by the SUBJECT. Located within the **TARGET DEVICE** to be searched, I seek to seize evidence, fruits, and instrumentalities of the foregoing criminal violation, where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of a crime.

## JURISDICTION

4. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

5. On May 3, 2024, an Amber Alert[1] was issued for JANE DOE, resulting in her location and recovery at the Super 8 by Wyndham Oklahoma/Frontier City, Oklahoma City, Oklahoma (motel). JANE DOE was alone in the room at the time of her recovery. A review of the motel surveillance camera footage showed an adult male, later identified as the SUBJECT, operating a black, 2015 Kia Optima, with Oklahoma license plate NGW691, and arriving at the motel with a juvenile female, who was later identified as JANE DOE, sitting in the front passenger seat. Further surveillance footage showed both the SUBJECT and JANE DOE check in to the motel and occupy room #738.

6. I conducted a forensic interview of JANE DOE at the motel on May 3, 2024. During the course of that interview, JANE DOE provided the following information:

7. JANE DOE had been living with her father in Arkansas for about one year. In the early morning hours of May 3, 2024, she texted her father from an RV, which was located on her father's property next to the house, that she was headed off to sleep. She woke up a few hours later, while it was still dark outside, in the back seat of a car she did not recognize. She

---

[1] Amber Alert is an emergency response system that disseminates information about a missing person (usually a child), by media broadcasting or electronic roadway signs. This specific Amber Alert was assigned the case number: 2024-0031803.

2

was alone in the car other than the driver whom she did not know. She went back to sleep shortly thereafter and woke up again around 10:00 a.m., alone, in a motel room. She went back to sleep soon afterwards and woke up again, still alone, in the same motel room later that afternoon. Using Google maps, she identified the address of the motel where she was located and texted that information to her mother. Shortly thereafter, officers from the Oklahoma City Police Department ("OCPD") located her and escorted her out of the motel room.

8.  Subsequently, I conducted a telephonic interview of JANE DOE's father, who provided the following information:

9.  JANE DOE's father returned home from work during the early morning hours of May 3, 2024. While getting ready for bed, he received a text from JANE DOE, who was located in the previously-referenced RV, letting him know she was headed to sleep. He went to get JANE DOE from the RV around 7:00 a.m. to take her to school, but she was missing. Soon thereafter, he found a handwritten note on a single sheet of paper that said in part: "Dad I am sorry but I am leaving to go live with someone I really love and he loves me back, and we are gonna go live together . . . ."

10. During the course of these interviews, the SUBJECT was located near his residence in Edmond, Oklahoma. After being detained on suspicion of the state felony charges of kidnapping and abduction, he was transported to the motel in an OCPD marked vehicle. I conducted a custodial interview of the SUBJECT, and, after he waived his *Miranda* rights, he provided the following information:

11. The SUBJECT, while living in Edmond, Oklahoma, which is within the Western District of Oklahoma, met JANE DOE online around January or February of 2024 after being

3

matched up on the OKCupid Dating: Date Singles application (dating site).[2] Utilizing the username, "ryan peterr," he described his motivation in using the site as wanting to find love and find someone with whom he could establish a long-term relationship. He was matched up with another user who identified herself as a 19-20 year old woman and who was later identified as JANE DOE.

12. Subsequent to meeting on the dating site, the SUBJECT and JANE DOE began communicating on Snapchat with the SUBJECT utilizing the username, "ryan_peterr" and JANE DOE utilizing the username, "abbeyforce24." The SUBJECT described the nature of their chats as discussing normal, everyday topics. After further questioning, the SUBJECT disclosed that he had used Snapchat to exchange sexually explicit images and videos with JANE DOE on May 2, 2024.

13. The SUBJECT went on to describe how, while he was located in his apartment in Edmond, Oklahoma and utilizing his iPhone XS Max, he took and sent JANE DOE a couple of pictures of himself without clothes, with his genitals exposed. JANE DOE sent him one picture and one video. The SUBJECT thought JANE DOE was located in the bathroom of her father's home when JANE DOE took both the picture and the video. JANE DOE was not wearing any clothes in either the picture or the video, and, during the video, JANE DOE was seated on the floor and inserting her fingers into her exposed vagina.

14. During the course of their online communications, JANE DOE described how her father engaged in abusive behavior towards her, including texts containing abusive language

---

[2] OKCupid Dating is a U.S.-based, internationally operating online dating and friendship,and formerly also a social networking website and application. It was formerly a social networking website. It is further advertised as a "17+" application.

4

and physical abuse. These facts, along with his belief he had developed a relationship with JANE DOE, culminated in his driving from Oklahoma to JANE DOE's father's home in Arkansas on May 2, 2024. After arriving around 11:30 p.m., the SUBJECT left shortly thereafter when notified by JANE DOE her father was on his way home. He drove to a nearby gas station and waited there for a couple of hours. He returned to JANE DOE's house around 2:00 a.m. on May 3, 2024, met JANE DOE at her front door, loaded a large and heavy bag belonging to JANE DOE into his car, and then left. He explained the note left for her father was written by JANE DOE.

15. The SUBJECT drove JANE DOE straight to the Oklahoma City area where they checked into the motel around 5:00 a.m. They both entered their assigned room around 5:30 a.m. and slept. Leaving JANE DOE in the motel room, the SUBJECT left around 10:30 a.m. to look for apartments or for a place where JANE DOE could stay. He returned to the motel around 1:30 p.m. with some food. He ate while JANE DOE watched television. They both slept more in the afternoon until he left for the last time around 5:30 p.m.

16. At some point after leaving the motel room for the last time, the SUBJECT became aware of the issuance of the Amber Alert and got scared. He drove back to the motel, and, upon finding a number of OCPD cars in and around the parking lot, he drove away towards his apartment in Edmond, Oklahoma, where he was eventually found and detained.

17. Upon further questioning, the SUBJECT provided more details about the activities that occurred between himself and JANE DOE while they spent time together in the motel room. He described at least some of their time together as involving "romance." He further described how he and JANE DOE engaged in "hugging" and "kissing." However, he denied anything further took place. During the course of the interview, the SUBJECT consented

to a search of the motel room. Located in the bathroom of the motel room a "crusty" towel was found, as described by the searching agents and officers.

18. During the course of the interview the subject disclosed he had two cell phones, one of which was later identified as the **TARGET DEVICE**. When asked where they were located, he replied with the police or in his vehicle. Later, following the interview, while discussing the disposition of the SUBJECT's vehicle with officers from the Oklahoma City Police Department, they told me it had been impounded, and the SUBJECT's phones were located inside. On May 8, 2024, I took custody of the SUBJECT's vehicle and observed two cell phones located on the console between the front driver and passenger seats.

## **CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS**

19. The following indicates characteristics of child pornography collectors that this Affiant has learned through training, working multiple investigations involving child pornography, and from other law enforcement officers with a background in child pornography investigations:

    a. The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

    b. The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

6

c. The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

d. The majority of individuals who collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings, and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

e. The majority of individuals who collect child pornography often collect, read, copy or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

f. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. They almost always maintain their collections in the privacy and security of their homes or other secure location.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

20. Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, computers, computer technology, and the Internet have revolutionized the manner in which child pornography is produced and distributed.

21. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

22. Child pornographers can transpose photographic images from a camera into a computer-readable format with a scanner. With digital cameras, the images can be transferred directly onto a computer. A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Through the Internet, electronic contact can be made to millions of computers around the world.

23. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

24. The Internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

25. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. These online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any

computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

26. As with most digital technology, communications made from a computer are often saved or stored on that computer. Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others. In addition to electronic communications, a computer user's Internet activities generally leave traces in a computer's web cache and Internet history files. A forensic examiner often can recover evidence that shows whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files that were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data. Likewise, devices such as cellular telephones, tablets, and e-readers are also capable of electronic storage as computers.

27. Due to modern computers' (including smart phones') abilities to store very large amounts of data, forensic examiners often can recover old computer activity and deleted computer activity, including deleted text messages, photo files, video files, etc. I also know that computer users can transfer digital files back and forth between computers (e.g., from smart phone to thumb drive) and also store files simultaneously on multiple devices. Thus, I am requesting permission to seize and search the **TARGET DEVICE** in the SUBJECT's vehicle.

9

## CONCLUSION

28. Based on the forgoing, I request that the Court issue the proposed search warrant authorizing the search of the accounts named in Attachment A for the items named in Attachment B, which constitute evidence, fruits, and instrumentalities of the foregoing violation.

29. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

David A. Garrison
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on May 10, 2024.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## **PROPERTY TO BE SEARCHED**

This warrant seeks to search an iPhone 15 Pro Max cell phone, with assigned phone number 737-297-7183, which is located in a vehicle that is registered to the SUBJECT.

## ATTACHMENT B

## **LIST OF ITEMS TO BE SEIZED**

1. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

2. In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

3. Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the operator of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

5. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic

messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

6. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to whose with an interest in child pornography.

7. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

8. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

9. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

10. Any and all visual depictions of minors.

2

11. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

12. Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

13. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).